* COLGATE & CO. v. LATTA & MYATT.

*Contract—Ambiguity—Parol Evidence, when Admitted to Explain—Written Contract—Trial.*

1. Whenever there is no uncertainty in the written words of a contract, their meaning is to be determined as a matter of law by the Court, and the legal consequences of the execution are to be adjudged as soon as the execution is admitted or proved; but when there is uncertainty in the written words, either because of ambiguity or incompleteness, it is for the jury to determine what was the agreement of the parties, and, in the trial of that issue, parol or extrinsic evidence is proper and necessary.

2. When, on the trial of an action on a written contract, a material question was whether defendants had agreed to purchase as large a

* CLARK, J., dissents.

COLGATE *v.* LATTA.

quantity of goods as plaintiff claimed, the plaintiff introduced extrinsic evidence to support his demand and to show that he had shipped to defendant a certain quantity of goods because the latter had orally agreed to purchase that quantity, plaintiff thereby opened the way for extrinsic evidence as to the meaning of the written contract.

This was a CIVIL ACTION, originally brought before a Justice of the Peace and carried, by appeal of plaintiffs, to the Superior Court, where it was tried *de novo* before *Hoke, J.,* and a jury, at February Term, 1894.

Before the Magistrate "the plaintiffs complained that the defendants are indebted to them in the sum of $170 and interest on same from January 1, 1892, balance of account for goods sold and delivered under a contract entered into on the 18th November, 1891." The defendants denied owing the account.

When the case came on for trial in the Superior Court, a jury was empaneled and plaintiffs offered and read in evidence the depositions of B. F. Bogart and Bowles Colgate, the material parts of which were as follows:

B. F. Bogart, a salesman for the plaintiffs, testified: "I went in to sell Latta & Myatt 100 boxes of Octagon soap, and the member of the firm that I saw told me 100 boxes was too much for him to handle; that he would take 50 boxes, but I could not give it to him at the 100-boxes price. Then he suggested to me to go to Norris & Bro., another wholesale grocery firm, and to say to them that if they would take half of the lot (50 boxes), he would let them have it at these terms. I returned to Latta & Myatt and told them what Norris had said, and he said 'All right; they are good'; and then he placed the order for 100 boxes in his own name. I sold the order to him only, not recognizing Norris in the sale, as it is against the rule of the house to take two parties into a deal. I sold Latta & Myatt the 100 boxes. Latta & Myatt wanted to buy 50 boxes at first at $3.60 per box, less twenty

cents per box, two per cent. cash, being the amount for which we offered to sell 100 boxes to them; but I told them that we could not sell less than 100 boxes on those terms, and it was then that he suggested that I go and see Norris & Bro. about taking 50 boxes off their hands.

Question. Is this (showing witness paper) the order that was signed by Latta & Myatt for the 100 boxes of Octagon soap? Answer. That is the original order.

Q. Is that their signature on this order? A. That is.

Q. Was that signed in your presence? A. Yes.

Q. Is the other signature above theirs your signature? A. Yes.

Plaintiffs' counsel offer in evidence the original order, dated the 18th day of November, 1891, signed by Latta & Myatt, and B. F. Bogart as salesman for Colgate & Co., marked "Plaintiffs' Exhibit A."

Q. Have you any authority to sell to any one customer less than 100 boxes of Octagon soap at a discount of twenty cents on a box? A. No.

Q. Had you ever done so? A. No; and, in fact, would not dare to.

Q. You swear positively that the sale of 100 boxes of Octagon soap was made to Latta & Myatt only? A. Yes.

Q. And that no sale whatsoever was made by you, representing Colgate & Co., to Norris & Bro.? A. No.

Q. Did you ever guarantee the credit of Norris & Bro. that they would pay for fifty boxes of the soap? A. No; Latta & Myatt said they were good, and that is all I know about it.

Q. What is the meaning of the word "Octagon," as used in this trade and business? A. That is the name of the soap.

Bowles Colgate, a member of the firm of Colgate & Co., being called, testified as follows:

Q. Did your firm, in the month of November, 1891, ship Latta & Myatt, at Raleigh, N. C., 100 boxes of Octagon soap

115—9.

in accordance with "Exhibit A" herewith shown you? (Paper shown witness.)   A. Yes.

Q. What was the value of the soap which you say you sold and shipped to Latta & Myatt?   A. The value of the Octagon soap was $340.

Q. And has any part of that been paid?   A. One-half of the bill, or $170, has been paid on account.

Q. And there is a balance due of how much?   A. $170.

Q. Are these figures the reasonable value for the goods so sold and delivered?   A. They are an especially low price.

Q. What is the meaning of the expression "less two per cent." in "Exhibit A"?   A. It refers to an allowance of two per cent. for cash if remitted within ten days from the date of the bill.

Q. And the figures 3.60 in the margin of the contract of "Exhibit A" mean what?   A. It represents the regular price of the soap, $3.60 per box.

Q. What is the meaning of "less twenty cents," as contained in "Exhibit A"?   A. This was a special allowance of twenty cents per box we were at the time making on single lots of 100 boxes bought by and shipped to one customer.

Q. And this twenty cents was only allowed in the event of the customer purchasing 100 boxes?   A. Not less than 100 boxes.

Q. Who is Mr. Benjamin F. Bogart?   A. Salesman in our employ.

Q. Did Mr. Bogart ever have any authority from you or your firm to sell less than 100 boxes of Octagon soap to any one customer at a discount of twenty cents a box?   A. He had not.

Q. Did Latta & Myatt ever make complaint to you, by letter or otherwise, of the fact that they had only purchased fifty boxes; that they were to be charged with fifty boxes? A. Not until they wrote us on the 19th of January, 1892.

Q. Do you know Norris & Bro., of Raleigh, N. C., or did

you ever have any dealings with them? A. We have had dealings with them.

Q. In connection with this sale of goods to Latta & Myatt? A. We knew nothing at all of any connection of theirs with this transaction, and never heard of their being interested in the matter in any way until we were so notified by letter from Latta & Myatt.

Q. If you had any notice of the claim which Latta & Myatt subsequently made on you would you have sold them any of the goods? A. We would not have filled the order if we had supposed the purchase would be divided with any other party.

"Exhibit A" was as follows:

Order No._____                                    11—18, 1891.
                  COLGATE & CO., NEW YORK,
Ship to LATTA & MYATT,
                  Raleigh, N. C.
Through Direct.
Time, 30 days.

| No. Boxes. | DESCRIPTION. | Size. | Price. |
|---|---|---|---|
| 100 | Octagon _____ | ____ ___ | 3.60 |
| | Less 20c. box ; less 2 per cent. | | |
| 1 | Gro. Turkish Bath _____ | _____ | Full |
| 1 | "  W. Castile, 4 oz _____ | ____ | Discount |

Large glass sign.                                    O K
                  No other condition of sale.
Purchaser_____
Salesman, B. F. Bogart.
Accepted, Latta & Myatt.

Plaintiffs then rested their case.

W. A. Myatt, one of the defendants, was offered as a witness on behalf of defendants. He stated that he made the contract on behalf of defendants with regard to the soap in controversy with B. F. Bogart, plaintiffs' agent. That he

signed the paper " Exhibit A," referred to in the deposition of B. F. Bogart.

Defendants' counsel then asked the witness, " State whether or not the whole contract between plaintiffs and defendants covering the soap in controversy was reduced to writing, or intended so to be."

Witness answered that it was not.

Defendants then asked witness, " State what was the contract between plaintiffs and defendants on November 18, 1891, concerning the soap in controversy."

Plaintiffs insisted that " Exhibit A" was the contract between the parties, and objected to any oral evidence which might tend to contradict the written paper, " Exhibit A."

Defendants' counsel then stated that defendants expected to show by this witness that the original contract between plaintiffs and defendants concerning the soap in controversy was oral and entire; that only a part of it was reduced to writing, or intended to be put in writing.

After hearing the argument of counsel on plaintiffs' objection, his Honor overruled plaintiffs' objection and permitted witness to testify, in substance, as follows:

" That the contract between plaintiffs and defendants was entire and oral, and the writing ' Exhibit A,' expresses part of said contract; that defendants purchased only fifty boxes Octagon soap from plaintiffs; that plaintiffs' agent tried to sell defendants 100 boxes of said soap in the morning of November 18, 1891, on the terms stated in ' Exhibit A,' and defendants declined to purchase it, but offered to take fifty boxes on the said terms; that plaintiffs' agent did not accept the offer then, and left defendants' store; that later in the day said agent returned, and said to defendants that he had sold to M. T. Norris & Bro., merchants doing business in Raleigh, fifty boxes of said soap, and if defendants would take the fifty boxes spoken of in the morning, plaintiffs would sell it to them at the price offered; that thereupon

COLGATE *v.* LATTA.

defendants purchased the fifty boxes; that plaintiffs' agent wrote out the order, 'Exhibit A,' signed it and handed it to witness for the signature of defendants; that witness at first declined to sign it because it was for 100 boxes of Octagon soap; that plaintiffs' agent assured witness that made no difference, that signing the order would be a convenience to the plaintiffs, and save plaintiffs freight'charges in shipping the goods; that by the terms of sale plaintiffs were to pay the freight on the soap; that the plaintiffs' agent also told witness that M. T. Norris & Bro. had bought fifty boxes of the Octagon soap referred to in the order, and that he would guarantee that defendants should be put to no trouble by signing the order for the whole 100 boxes."

To so much of the above testimony as tended to contradict the paper-writing above referred to, marked "A," the plaintiffs, in proper time, objected. Objection overruled, and plaintiffs excepted.

It was admitted by plaintiffs that defendants had paid plaintiffs for all the goods mentioned in "Exhibit A," except for fifty boxes of the 100 boxes of Octagon soap mentioned in said paper, leaving in controversy, without prejudice to plaintiffs, the price of the fifty boxes which defendants contended had been sold by plaintiffs to M. T. Norris & Bro., and not to defendants.

Defendants then introduced W. C. Norris, of the firm of M. T. Norris & Bro., as a witness, who testified that the salesman of Colgate & Co., to-wit, B. F. Bogart, sold M. T. Norris & Bro., on November 18, 1891, fifty boxes of Octagon soap; that witness did not know Latta & Myatt in the transaction until the soap came to Latta & Myatt and they turned over to Norris & Bro. the fifty boxes of said soap that they had bought from plaintiffs.

The plaintiffs, in proper time, objected to such of the above testimony of W. C. Norris as tended to contradict said paper-writing, "Exhibit A." Objection overruled, and plaintiffs excepted.

Plaintiffs, in proper time, offered the following written prayer for special instructions: " In no event could the jury find that Latta & Myatt ordered a less number of boxes of Octagon soap than was specified in the contract."

This instruction was refused, and plaintiffs excepted. This was the only exception to the Judge's charge.

There was a verdict for the defendants. Plaintiffs moved for a new trial upon the ground of errors committed, as they contended, in the rulings of the Judge on the matters above set out in this case on appeal. Motion overruled, and plaintiffs excepted and appealed from the judgment thereon.

*Messrs. Strong & Strong,* for plaintiffs (appellants).
*Messrs. Battle & Mordecai,* for defendants.

BURWELL, J.: In *Cumming* v. *Barber*, 99 N. C., 332, it is said that " if it appear that the entire agreement was not reduced to writing, or if the writing itself leaves it doubtful or uncertain as to what the agreement was, parol evidence is competent, not to contradict, but to show and make certain what was the real agreement of the parties, and, in such case, what was meant is for the jury under proper instructions from the Court."

Mr. Abbott in his work on Trial Evidence, page 294, says: " In the present state of the law, the rule excluding parol to vary a writing in its application to commercial sales, amounts to little more than this principle, viz.: that where the parties, or their agents, have embodied the terms of their agreement in writing, neither can, in an action between themselves (unless impeaching the instrument), give oral evidence that they did not mean that which the instrument, when properly read, expresses or legally implies, or that meant something inconsistent therewith. In more detail, the rule and its established exception may be stated thus: A written instrument, although it be a contract within the meaning of

the rule on this point, does not exclude oral evidence tending to show the actual transaction in the following cases: (5) Where the language of the instrument leaves its meaning doubtful, or extrinsic facts in evidence raised a doubt as to its application; (6) where it appears that the instrument was not intended to be a complete and final statement of the whole transaction, and the object of the evidence is simply to establish a separate oral agreement in a matter as to which the instrument is silent, and which is not contrary to its terms nor to their legal effect."

The plaintiffs insist that there was a contract between them and the defendants by which the latter agreed to purchase from them 100 boxes of soap at $3.40 per box, and the plaintiffs agreed to sell to them such a lot of soap at that price.

They contend that the writing, "Exhibit A," contains the entire agreement between the parties here, and that its meaning is free from doubt and ambiguity, and that the only evidence needed to maintain this action was proof that the defendants signed their names on said writing after the word "Accepted," and that the plaintiffs thereafter shipped to them one hundred boxes of Octagon soap.

There is not about this instrument that absolute certitude of meaning which is required to enable a Court to declare exactly what the agreement of the parties actually was by a bare inspection of the writing. It is, of course, true that it is of the utmost importance that where contracts have been thus evidenced the parties should be held bound by their written statement of what their agreement was. This principle has always been considered "one of the greatest barriers against fraud and perjury," and its abrogation or impairment would produce very great evils. It should not be construed away, or the exceptions to it multiplied to avoid the seeming hardship of particular cases.

But, while this is true, it must also be conceded that the

writing to which such importance is to be attached must be explicit and complete. Wherever there is no uncertainty in the written words, their meaning is to be determined, as a matter of law, by the Court, and the legal consequence of the execution of the writing is to be adjudged as soon as the execution of it is admitted or proved. Wherever there is uncertainty in the written words, either because of ambiguity or incompleteness, it is for the jury to determine what was the agreement of the parties, and, in the trial of that issue, extrinsic evidence is proper, and, indeed, necessary.

The writing upon which the plaintiffs rely in this action (Exhibit A) seems to us ambiguous and uncertain. We do not here have reference to the terms in which the price of the soap is expressed, which, the plaintiffs themselves seem to grant, clearly require explanation, but to the fact that in it there is no explicit statement either that the plaintiffs have sold to the defendants one hundred boxes of soap, or that the defendants have bought from the plaintiffs that quantity of goods. In it their salesman directs Colgate & Co. to ship to Latta & Myatt certain goods. There is in the order a place for the name of the purchaser, which is left blank. At the bottom of the order is the word, "Accepted," followed by the signature of the defendant firm. As soon as this document is attentively examined, there arises a doubt as to its meaning. The fact that such a doubt arises is an assurance that an explanation of it is necessary, that requires the introduction of extrinsic evidence, and makes an issue for the jury to decide.

While parties, by reducing their commercial contracts to writing, may make their obligations so binding that the law, upon mere proof of the execution of the instrument, will adjudge the rights of those who are thus careful to fix the memorials of their agreements, they must use skill in the composition of such writings, and must carefully avoid all uncertainty of expression, for, as we have said, such ambiguity

in'the writing necessarily lets in parol, or, to speak accurately, extrinsic, evidence to explain away the ambiguity, and by this means the good purpose of the writing is defeated, not by the fault of the law, but by the unskillfulness or carelessness of the parties themselves. Because of this ambiguity in this writing, we think it was proper to admit extrinsic evidence to show that the plaintiffs did not agree, by their agent, to sell to the defendants one hundred boxes of soap, and that the defendants did not agree to purchase that quantity, but that, as the writing itself discloses, that number of boxes was to be *shipped* to the defendants, for some purpose not set out in that instrument, but which the extrinsic evidence shows, and the jury have found, was that they should turn over one-half of the lot to Norris & Bro., this last named firm and the defendants being the real purchasers under this contract, each buying one-half of the soap.

The extrinsic evidence which his Honor admitted over the objection of the plaintiffs did not, in our opinion, tend to contradict the writing, and was competent. This ruling disposes of all the exceptions.

The record shows that when the plaintiffs opened their case, they themselves deemed it necessary to introduce evidence extrinsic to the written memorandum, in order to support their demand against the defendants, and to show that they had shipped the goods (one hundred boxes soap) to defendants, because they had agreed orally to purchase that number of boxes. Having thus opened the way for such evidence, they should not be allowed to object to the defendants being permitted to meet that extrinsic evidence with evidence of like kind. However, we do not think the plaintiffs' able counsel committed an error on the trial of the case before the jury, but rather that the view they seem then to have taken of this writing was a correct one.          No Error.

CLARK, J. (dissenting): The paper, on its face, is an order by the agent on his principals, Colgate & Co., to ship to the defendants 100 boxes of soap at $3.60, less 2 per cent. discount. This was agreed to by defendants, who wrote their acceptance below the above specification of quantity and price. This made a contract. It was forwarded to Colgate & Co., who shipped to the defendants the 100 boxes at the agreed price. That evidence was introduced to explain that the price was $3.60 per box, and not per 100 boxes, does not authorize any evidence to contradict that the quantity was 100 boxes, which is unmistakably set out in the contract. Still less does the fact that evidence was necessarily admitted to show the shipment of the goods under the contract authorize oral testimony to contradict the written agreement "accepting" an order to ship 100 boxes. There are cases where the contract is partly in writing and partly oral. In such cases, the additional oral agreement is admissible, provided it does not contradict or alter the part of the contract which is reduced to writing. *Nissen* v. *Manufacturing Co.*, 104 N. C., 309. But here the written agreement being to "accept" 100 boxes to be shipped at $3.60, less 2 per cent., a contemporaneous verbal agreement to take and pay for only fifty boxes is a palpable contradiction of the plain, unequivocal written terms of the contract, and was inadmissible.